UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANTWOINE DE'SEAN PARMER,

                                    Plaintiff,

        v.

WASHINGTON DEPARTMENT OF
CORRECTIONS, JOHN and JANE
DOE, DR. NAVARRO, DR.
CUAYCONG,

                                    Defendants.

No. C11-5390 RBL/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  February 1, 2013**

Before the Court is the motion for summary judgment of Defendants Washington State Department of Corrections, Godofredo L. Navarro M.D., and Mary Jean Cuaygong M.D.  ECF No. 23 (renewed at ECF No. 42).  The motion was originally filed on April 16, 2012 (ECF No. 23) and was renewed on September 4, 2012 (ECF No. 42), pursuant to this Court's Order allowing the completion of discovery.  ECF No. 40.  On May 7, 2012, Plaintiff Antwoine Parmer filed his response and cross-motion for summary judgment.  ECF No. 33.  On September 25, 2012, Plaintiff filed a response to Defendants' "renewed" motion and cross-motion for summary judgment.  ECF No. 45.

Having reviewed the motions, opposition and supporting declarations and balance of the record, the Court recommends that Defendants' motion for summary judgment be granted and that Plaintiff's cross-motion for summary judgment be denied.

REPORT AND RECOMMENDATION - 1

**SUMMARY OF CASE**

Mr. Parmer alleges that while he was incarcerated at Washington Correction Center (WCC), he was denied adequate medical care for the treatment of diabetic retinopathy, a complication of diabetes mellitus.  If not treated, diabetic retinopathy can lead to the destruction of the retina and loss of vision.  Mr. Parmer claims that Dr. Navarro and Dr. Cuaycong were deliberately indifferent to his medical needs by failing to return him for follow-up treatment within six to eight weeks after he received laser treatments in November 2008.  He claims that this delay caused his retina to detach, which required additional surgery in May 2009.  He claims that the retinal detachment and surgery could have been avoided altogether if follow-up laser treatments had been provided as was recommended by the eye specialist.  Plaintiff alleges that he is now partially disabled with loss of vision in his right eye, pain, frequent dizziness, headaches, and cataracts.

**ADMISSIBILITY OF DEPOSITION TRANSCRIPTIONS**

By Order dated June 11, 2012, the Court granted Plaintiff's motion to continue Defendants' original motion for summary judgment (ECF No. 23) so that Plaintiff could take the depositions of Drs. Navarro and Cuaycong.  ECF No. 40.  Plaintiff was permitted to take the depositions by tape recording no later than August 24, 2012, after which Defendants were entitled to renew their summary judgment motion.  *Id.*

In his response to Defendants' renewed summary judgment motion, Plaintiff submitted and relied on unofficial transcriptions of the depositions of Dr. Cuaycong and Dr. Navarro.  ECF No. 48 (Exhibits G and H).  Defendants confirm that the depositions proceeded by telephone on August 21, 2012 for Dr. Cuaycong and August 23 and 28, 2012 for Dr. Navarro.  Defendants' counsel paid the expense of having Joni Novak, a licensed court reporter, attend the depositions,

REPORT AND RECOMMENDATION - 2

administer the oath, and make the necessary recordings with her recording equipment.  In addition the court reporter made a stenographic recording of the testimony.  ECF No. 49, p. 2.  Sealed copies of the cassette tapes were filed in this case on August 27, 2012 (Dr. Cuaycong) and September 7, 2012 (Dr. Navarro).  Neither party ordered an official transcription of the deposition testimony.

Defendants object to consideration of the unofficial transcriptions.  However, for a limited issue they also rely on portions of the unofficial record in their reply.  *See, e.g.*, ECF No. 49, pp. 4-5.   The unofficial transcriptions do not comply with Fed. R. Civ. P. 30(f)(1), which requires that the officer who conducted the deposition certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony.  In addition, Rule 28(c) provides that the officer before whom a deposition is taken (and who must certify the transcription pursuant to CR 30(f)) may not be a party interested in the action, any party's relative or employee or in any way related to a party to the action.  Thus, Plaintiff's own transcription of the deposition testimony would not be admissible in court, whether made a part of Plaintiff's response or Defendants' reply in these summary judgment proceedings.

Accordingly, the Court has not considered those portions of the unofficial transcripts cited to or relied on by either party.   However, the undersigned has reviewed the transcripts and, even if they were considered, they would not change the outcome of this Report and Recommendation.

## STATEMENT OF FACTS

Mr. Parmer has been a diabetic since 1995.  ECF No. 12, at p. 5, ¶ 2.  His medical records indicate a history of insulin dependent diabetes mellitus (IDDM) dating back 12 years.  ECF No. 26 (Declaration of John D. Kenney, M.D.), ¶ 2, Exhibit A.  It is undisputed that in 2007 and

2008 Mr. Parmer had difficulty controlling his blood sugar levels and that he failed to keep several follow-up appointments to monitor his diabetic medications. *Id.*, ¶¶ 4-5.

In the fall of 2008, Mr. Parmer began to see floaters and blood swirling in his right eye. ECF No. 12, at p. 5, ¶ 2 (Plaintiff's Complaint). He signed up for sick call on October 29, 2008 at the Washington Corrections Center (WCC) infirmary. He alleges that he was seen on October 30, 2008 by Dr. Navarro. *Id.* Dr. Navarro is a Department of Corrections (DOC) contract physician who, during 2008 through 2010, was assigned to the WCC. ECf No. 24 (Declaration of Godofredo L. Navarro), ¶ 1-3. Contrary to Mr. Parmer's allegation in his complaint, the records are clear that Mr. Parmer was seen by Physician's Assistant (PA) Holloway in the WCC medical clinic on October 30, 2008 and not Dr. Navarro. PA Holloway prepared a consult report referring Mr. Parmer to Clarus Eye Clinic, a retinal specialty clinic located in Lacey, Washington. Dr. Navarro immediately approved the consult and Mr. Parmer was seen by Dr. Penny Reck, an ophthalmologist at Clarus Eye Center, on the same day. ECF No. 12, ¶2; ECF No. 24 (Navarro Decl.), ¶ 4. *Id.*

**A.    Treatment by Dr. Reck**

Dr. Reck examined Mr. Parmer on October 30, 2008 and found that Mr. Parmer had suffered a vitreous hemorrhage (VH) in his right eye. Dr. Reck diagnosed proliferative diabetic retinopathy (PDR) in both eyes. ECF No. 26 (Kenney Decl.), ¶ 10; ECF No. 25 (Declaration of Mary Jean Cuaycong M.D.), ¶ 2; ECF No. 35, p. 3.

According to Drs. Kenney and Cuaycong, PDR is a sequel of long standing diabetes mellitus (DM). Due to progressive ischemia (lack of blood supply) in the retina, abnormal blood vessels form and grow. The new blood vessels that develop are not normal structurally and can bleed spontaneously to cause sudden, severe and painless visual loss. The growth of new blood

REPORT AND RECOMMENDATION - 4

vessels (neovascularization) disrupts normal retinal structure and may cause detachment of the retina with subsequent further loss of vision.  ECF No. 26 (Kenney Decl.), ¶ 10; ECF No. 25 (Cuaycong Decl.), ¶ 16.  ECF No. 25 (Declaration of Mary Jean Cuaycong M.D.),

PDR is a devastating ocular sequel of a silently progressive systemic disease – diabetic mellitus.  According to Dr. Cuaycong, studies have shown that the longer a person has DM, the higher the risk for developing diabetic retinopathy and that those with insulin-dependent DM are three times more likely to develop retinopathy than those who are not insulin-dependent.  The records reflect that Mr. Parmer had a history of insulin dependent DM dating back 12 years. ECF No. 26 (Kenney Decl.), ¶ 2, Exhibit A.

Some degree of diabetic retinopathy is seen in upward of 90 percent of such patients by 10-15 years after the diagnosis of DM.  Diabetic retinopathy typically has no warning signs until the first hemorrhages appear in the eye.  Hemorrhages are caused by the bleeding of blood vessels which form in the back of the eye as the disease progresses.  The proliferation of the abnormal blood vessels are caused by high glucose levels which result in damage to tiny retinal blood vessels which reduce the flow of blood to eye tissue supplied by those blood vessels. Without proper treatment, the new blood vessels can spontaneous bleed and eventually destroy the retina.  Even with proper treatment, new hemorrhages can appear as the disease progresses. ECF No. 25 (Cuaycong Decl.), ¶ 16; ECF No. 26 (Kenney Decl.), ¶ 13.

Dr. Reck's examination of the Plaintiff's on October 30, 2008 showed Plaintiff had a vitreous hemorrhage (VH) in the right eye.  The diagnosis was proliferative diabetic retinopathy (PDR) in both eyes and Dr. Reck scheduled a series of laser treatments for the right eye.  ECF No. 35, p. 6.  Dr. Reck performed two laser surgeries (Panretinal Photocoagulation or PRP) on November 18 and November 25, 2008.  According to Drs. Kenney and Cuaycong, PRP is the

REPORT AND RECOMMENDATION - 5

standard treatment to shrink the abnormal blood vessels which occur with diabetic retinopathy. Consistent with standard practices, the two laser treatments proceeded, after the vitreous hemorrhage noted on October 30, 2008, had sufficiently cleared to allow the procedure.  ECF No. 25 (Cuaycong Decl.), ¶ 3.

In her Ophthalmic Laser Record dated November 25, 2008, Dr. Reck noted that Mr. Parmer had tolerated the procedure well and was to return to the clinic in "6-8 weeks" for "Ret V On" [illegible].  ECF No. 25, p. 6.

Plaintiff alleges that after the laser treatments his eye condition worsened and his eye was filling up with blood every day.  In a kite dated February 24, 2009, Mr. Parmer requested another visit to an eye specialist: "I need another visit to eye specialist.  FOLLOW-UP  Blood leaking in my right eye still & it's filling up quicker than usual!  Thank you.  P.S.  I don't wish to go blind behind this correctable issue."  ECF No. 35, p. 1.  He was seen on March 6, 2009 by Dr. Bednarczyk at WCC's infirmary.  According to Mr. Parmer, both he and Dr. Bednarczyk spoke to Dr. Reck and Dr. Reck stated that Plaintiff should have returned six to eight weeks after his last laser treatment for more laser treatments and exams and requested that Plaintiff be seen as soon as possible.  ECF No. 12, at p. 6, ¶ 3.

Defendants do not dispute that there was no follow-up with Dr. Reck within the recommended six to eight weeks.  According to Dr. Cuaycong, Mr. Parmer did not return until March 13, 2009, when he was referred back to Dr. Reck for treatment of a "new" hemorrhage. ECF No. 43 (Cuaycong Suppl. Decl.), ¶ 3.

In her March 13, 2009 medical note, Dr. Reck wrote "regressing proliferative diabetic retinopathy, vitreous hemorrhage right eye."  ECF No. 25 (Cuaycong Decl.), ¶¶ 4,5; ECF No. 43 (Cuaycong Suppl Decl.), ¶ 3.  In a letter dated April 2, 2009, Dr. Reck noted that she again saw

Mr. Parmer for "fill-in panretinal photocoagulation in the right eye," but was unable to perform laser treatment "due to increased vitreous hemorrhage."  She notes that although she recommended that Mr. Parmer return for follow-up in six weeks following the PRP treatment in November 2008, he did not follow-up until February 13, 2008[1] [sic].  ECF No. 35, p. 3. At that time, she recommended that Mr. Parmer be referred urgently to a retina specialist for evaluation and management.  *Id.*

Dr. Bednarczyk signed the WCC consult request form on March 19, acknowledging review of the consult assessment and recommendations.  ECF No. 25 (Cuaycong Decl.), ¶ 4.  Dr. Bednarcyzk saw Mr. Parmer again on April 2, 2009.  At that time, Dr. Bednarcyzk noted that further laser surgery would not be effective to treat the VH and that a "bigger procedure" was needed.  Mr. Parmer was referred to Retina Consultants, a surgical group specializing in vitreoretinal diseases based in Seattle, Washington.  *Id.*

Mr. Parmer disputes that the first vitreous hemorrhage had sufficiently cleared and that a "new" vitreous hemorrhage formed in March 2009.  Rather, he contends that the initial hemorrhage was "non-clearing" and "persistent."  He refers to Dr. Reck's letter dated April 2, 2009.  ECF No. 33; ECF No. 35 (Exhibit B).  In that letter, Dr. Reck states that she had recommended that Mr. Parmer return for follow-up in six weeks, "but due to scheduling issues beyond my control, he did not follow-up until February 13, 2008 [sic].  At that visit … dilated exam demonstrated *persistent* vitreous hemorrhage in the right eye with regressing neovascularization."  *Id.*, Exhibit B, p. 3 (emphasis added).  When Mr. Parmer returned for treatment on April 2, 2009, Dr. Reck noted that the laser treatment could not be performed due to

---

[1] Dr. Reck refers to February 13, 200<u>8</u>.  However, this is obviously a typographical error because Plaintiff's first treatment was in November 2008 and he was to follow-up in six weeks, but did not follow-up until March 13, 2009.

REPORT AND RECOMMENDATION - 7

"increased vitreous hemorrhage."  Dr. Reck summarized as follows:  Mr. Antwoine Parmer is a 37 year-old man with poorly controlled diabetes with proliferative diabetic retinopathy and a *non-cleaering* [sic] vitreous hemorrhage."  *Id.* (emphasis added).  Mr. Parmer provides no independent medical evidence to support his conclusion that Dr. Reck's use of the word "persistent" and "non-clearing" means that he was suffering from the same hemorrhage and not a new one that formed naturally in the progression of his DM.

According to Dr. Cuaycong, the note in Dr. Reck's medical records of March 13, 2009, where she wrote "regressing proliferative diabetic retinopathy, vitreous hemorrhage right eye", meant that Mr. Parmer's right eye had responded to the prior laser treatments – regardless of whether the plaintiff had returned to Dr. Reck one or two months earlier.  The new vitreous hemorrhage diagnosed by Dr. Reck on March 13, 2009 was not amenable to laser treatment.  ECF No. 43 (Cuaycong Suppl. Decl.), ¶ 3.

Mr. Parmer alleges that when he was seen by Dr. Reck on April 2, 2009, she told him that she was unable to perform any more laser treatments because of the delay between laser operations.  ECF No. 12, p. 6, ¶ 4.  Dr. Reck told him that his condition had worsened, that there was too much blood accumulation in his right eye for the laser to be effective, and that he would need a more severe and major surgery just to pick up where his last laser operation left off.  *Id.*  Mr. Parmer claims that when he expressed fear and a hesitancy to proceed with more surgical procedures, Dr. Reck told him that if he did not have the surgery, his "eye would die and [he] would lose it altogether."  *Id.*  Dr. Reck referred Plaintiff to Dr. Drucker, a retina specialist.  ECF No. 12, at p. 7, ¶ 5.

//

//

REPORT AND RECOMMENDATION - 8

**B.      Treatment by Dr. Drucker**

On April 7, 2009, Mr. Parmer was seen by David Drucker M.D. and Dr. Jay Haynie of Retina Consultants.  He was diagnosed with retinal detachment of the right eye and macular edema in the left eye.  Surgery was scheduled for May 7, 2009 to repair the detached retina in Mr. Parmer's right eye.  ECF No. 25 (Cuaycong Decl.), ¶ 5; ECF No. 26 (Kenney Decl.), ¶ 11.

On April 13, 2009, Dr. Cuaycong received and reviewed the consult report from Retina Consultants noting that Mr. Parmer was scheduled for surgical repair on May 7, 2009.  Dr. Cuaycong ordered the lab work requested by Retina Consultants and personally brought the lab slips to the lab at the WCC medical center to ensure that the lab received the request.  ECF No. 25 (Cuaycong Decl.), ¶ 6.

In a Health Services Kite dated April 16, 2009, Mr. Parmer states "My eyes is [sic] full of blood.  Has my surgery been scheduled?  95% loss of sight now!"  ECF No. 35, p. 2.

Dr. Cuaycong saw Mr. Parmer on May 5, 2009 at the WCC medical clinic.  This is the only time Dr. Cuaycong personally saw Mr. Parmer.  At that time Mr. Parmer expressed concern about the one month delay between April 7, 2009, the date Dr. Drucker diagnosed the detached retina of the right eye, and the surgery scheduled for May 7, 2009.  In her examination on May 5, 2009, Dr. Cuaycong noted that there was no real deterioration of Mr. Parmer's vision in the right eye between Dr. Drucker's examination on April 7th and her examination on May 5th, suggesting relative stability of vision.  ECF No. 25 (Cuaycong Decl.), ¶ 7.

Because Mr. Parmer was concerned, Dr. Cuaycong spoke by telephone with Dr. Haynie of Retina Consults that same day.  He assured Dr. Cuaycong that the surgery timeline would not adversely affect Mr. Parmer's condition.  The greater concern expressed by Dr. Haynie was Mr. Parmer's long history (now over 15 years) of diabetes mellitus and the progressive damage to

REPORT AND RECOMMENDATION - 9

Mr. Parmer's retina over that long period of time.  Dr. Haynie advised Dr. Cuaycong that Mr. Parmer's visual prognosis was "guarded".  *Id.*

**C.    May 7, 2009 Surgery and Post-Operative Care**

The surgical re-attachment of Mr. Parmer's right eye was performed at the Northwest Hospital in Seattle by Dr. Drucker on May 7, 2009.  During the surgery, Mr. Parmer received an injection of Intravitreal (IV) Avastin in his left eye to treat macular edema diagnosed in the left eye.  Mr. Parmer remained in the Seattle hospital overnight and was transported back to the medical clinic at WCC the following day, on May 8, 2009.  ECF No. 25 (Cuaycong Decl.), ¶ 8. Mr. Parmer alleges that Dr. Drucker told him that the surgery to repair the damaged retina took twice the normal time due to the delay in previous treatments.  ECF No. 12, p. 7.

Dr. Navarro admitted Mr. Parmer to the WCC infirmary for post-operative care on May 8, 2009, after Mr. Parmer returned from the Northwest Hospital where Dr. Drucker performed the retinal re-attachment surgery on May 7, 2009.  ECF No. 24 (Navarro Decl.), ¶ 5.  Dr. Navarro ordered that Mr. Parmer lie face down during the day and on his right side at night and to wear the eye patch provided for the right eye.  He also ordered that Mr. Parmer have his normal medications for diabetes including insulin and that he be provided with the eye medications recommended by the surgeon and medication for post-operative pain for 14 days. ECF No. 24 (Navarro Decl.), ¶ 5.

On May 11, 2009, Dr. Cuaycong saw Mr. Parmer in the WCC infirmary where he was recovering from surgery.  Dr. Cuaycong noted that Mr. Parmer was not wearing the eye shield over his right eye as he had been instructed.  Dr. Cuaycong reminded Mr. Parmer to wear the eye shield and also reminded him of the importance of maintaining a face down position or lying on his right side for optimal healing after surgery.  ECF No. 43, Supplemental Declaration of Mary

Jean Cuaycong, M.D., ¶ 1.  On May 12, 2009, Dr. Cuaycong discharged Mr. Parmer from the WCC infirmary and ordered medications prescribed by his surgeon, which included Tobradex and Timolol.  She also ordered follow-up appointments with Dr. Drucker and Dr. Penny Reck.  Infirmary notes indicate that Dr. Cuaycong was in contact with Dr. Drucker and his staff to coordinate Mr. Parmer's postoperative care and follow-up.  *Id.*, ¶ 2.  According to Dr. Cuaycong, Plaintiff did not see Dr. Drucker the week after surgery as she had ordered on his discharge from the WCC infirmary, but did return to see Dr. Reck in June of 2009, as ordered at the time of discharge.  ECF No. 43, p. 3, ¶ 4.

Mr. Parmer was seen for follow-up care by Dr. Reck in June and July 2009, for additional procedures on his right eye.  ECF No. 25 (Cuaygong Decl.), ¶ 10.  On June 9, 2009, Dr. Reck noted that Mr. Parmer's DM was in "poor control."  It was noted that Mr. Parmer was "doing well" one month after surgical repair of the traction retinal detachment (TRD) of his right eye and that the PDR OD was regressing."  However, clinically significant macula edema (CSME) was noted in the right eye.  *Id.*  According to Dr. Cuaycong, CSME is another sequel of DM.  Longstanding, poor blood flow to the retina can cause swelling and fluid accumulation in the macula, which is the center of the retina and responsible for clear central vision.  At the time of the visit with Dr. Reck, Mr. Parmer's vision was recorded as 20/800 in his right eye and 20/25 in his left eye.  Dr. Reck recommended treatment for the CSME.  This included intravitreal (IV) Avastin followed by focal laser treatment OD.  Mr. Parmer returned to Clarus Eye on July 22, 2009 for IV Avastin and on July 30, 2009, for the subsequent focal laser treatment.  *Id.*; ECF No. 35, p. 7.

In her July 22, 2009 report, Dr. Reck noted that she had injected Mr. Parmer with Avastin in his right eye and that he was returning to her in one week for focal laser treatment.  She also

recommended that "he return to Dr. David Drucker for further evaluation regarding surgical repair of the tractional retinal detachment in the right eye." ECF No. 35, p. 7.

In a Health Services Kite dated September 11, 2009, Mr. Parmer states "[m]y eye (right) that I had my surgery on four months ago is still giving me problems.  I believe I was suppose[] to have been returned to Clarus for follow ups." ECF No. 35, p. 4.  He was told to sign up for sickcall.  *Id.*

In a Health Services Kite dated October 29, 2009, Mr. Parmer wrote: "[m]y eye is feeling like the retina is detached or ripped again.  Clarus Center needed me back for follow up 2 months ago.  Never happened.  Why?" ECF No. 35, p. 5.

**D.    November 2009 Hemorrhage**

On November 13, 2009, Mr. Parmer was seen at the WCC clinic complaining of blurred vision.  Physician's Assistant Figueroa examined Mr. Parmer and prepared a consult request.  Dr. Navarro approved the consult on the same day.  ECF No. 24 (Navarro Decl.), ¶ 6.  Mr. Parmer was seen by Dr. Reck on November 17, 2009.  On her consultation report, Dr. Reck stated "vitreous hemorrhage right eye; tractional retinal detachment".  She also stated:  "See 7/22/09 letter – patient requires surgical intervention/ consultation with Dr. Drucker.  Patient has <u>not</u> followed-up with Drucker as recommended." ECF No. 41, p. 2 (emphasis in original).   In Dr. Reck's medical notes dated November 17, 2009, she wrote that Mr. Parmer "never went back to see Dr. Drucker as recommended".  ECF No. 35, p. 9.

**E.    Referral to Dr. Yeh**

When Mr. Parmer returned to WCC after his visit with Dr. Reck on November 17, 2009, Dr. Cuaycong immediately prepared a referral for Mr. Parmer to see Husuhi Yeh M.D., a retinal specialist in Tacoma.  ECF No. 25 (Cuaycong Decl.), ¶ 11.  Dr. Cuaycong states that she spoke

REPORT AND RECOMMENDATION - 12

directly with Dr. Yeh on November 17, 2009, to expedite his seeing Mr. Parmer.  Dr. Cuaycong

also considered the fact that Dr. Yeh was in Tacoma, which location would facilitate any

transportation considerations.  *Id.*  This referral was Dr. Cuaycong's last involvement with Mr.

Parmer's medical care.  Records show that Mr. Parmer was transferred to SCCC by December

15, 2009.  ECF No. 25 (Cuaycong Decl.), ¶ 11.

      Mr. Parmer was transported to Tacoma to see Dr. Yeh on November 20, 2009.  *Id.*

According to Dr. Cuaycong's record review, Dr. Yeh noted Mr. Parmer's vision as 20/400 in the

right eye and 20/25 in the left eye and no retinal detachment.  However, Dr. Cuaycong states that

there was a new vitreous hemorrhage in Mr. Parmer's right eye.  Dr. Yeh noted "good sclera

buckling effect" and the vitrectomy surgery that had been performed by Dr. Ducker earlier in

2009.  He stated that Mr. Parmer was doing "reasonably well."  ECF No. 43 (Cuaycong Suppl.

Decl.), ¶ 5.  Mr. Parmer was scheduled for additional laser treatment on January 5, 2010.

Records indicate that Mr. Parmer returned to see Dr. Yeh for follow-up on March 10, 2010 and

July 20, 2010.  ECF No. 25 (Cuaycong Decl.), ¶ 12.  He continues to be seen by Dr. Yeh as

needed to treat diabetic retinopathy.  ECF No. 26 (Kenney Decl.), ¶ 13.

### STANDARD OF REVIEW

      The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence

of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d

1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce

any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the

absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato*

REPORT AND RECOMMENDATION - 13

*Johnson*, 212 F.3d 528, 532 (9th Cir.2000).  A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law.  *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even when a party appears *pro se*.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

REPORT AND RECOMMENDATION - 14

**DISCUSSION**

**A.    Eight Amendment Claims**

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the violation of a right secured by the Constitution and laws of the United States, and (2) the deprivation was committed by a person acting under color of state law.  *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir.1988).  A person subjects another to a deprivation of a constitutional right when committing an affirmative act, participating in another's affirmative act, or omitting to perform an act which is legally required.  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978).  To hold a defendant liable for damages, the wrongdoer must personally cause the violation.  *Leer*, 844 F.2d at 633. There is no respondeat superior liability.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Thus, a supervisor is liable under § 1983 only if he/she "participated in or directed the violation, or knew of the violation and failed to prevent it."  *Id.*

Mr. Parmer alleges that Defendants are liable under the Eighth Amendment for failing to provide the recommended follow-up treatment.  To establish a constitutional violation under the Eighth Amendment due to inadequate medical care, a plaintiff must show "deliberate indifference" by prison officials to a "serious medical need."  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).   For an inmate to state a claim under § 1983 for medical mistreatment or denial of medical care, the prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); Estelle, 429 U.S. at 106. "Because society does not expect that prisoners will have unqualified access to health care,

REPORT AND RECOMMENDATION - 15

deliberate indifference to medical needs amounts to an 8th Amendment violation only if those needs are 'serious.'" *Hudson*, 503 U.S. at 9.

Here, it is undisputed that Mr. Parmer's diabetic retinopathy secondary to longstanding diabetes metillus constituted a "serious medical need." (ECF No. 56 at 7.)  Once a serious medical need is shown, the inmate must show the defendant's response to the medical need was "deliberately indifferent."  *Estelle*, 429 U.S. at 104.  Deliberate indifference to a prisoner's medical needs is defined by the Court as the "unnecessary and wanton infliction of pain."  *Id*. However, mere negligence in the provision of medical care does not constitute a constitutional violation.  *Estelle*, 429 U.S. at 104.

Indifference proscribed by the Eighth Amendment may be manifested by a prison doctor's response to the prisoner's need, by the intentional denying or delaying access to medical care, or the intentional interference with treatment once prescribed.  *Id.*   A prison official may also be found to have acted with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.  For example, in *Hamilton v. Endell*, 981 F.2d 1062 (9th Cir.1992), prison officials transferred Hamilton via airplane despite instructions from Hamilton's physician that he should not fly anywhere for six months due to a chronic ear problem.  *Id*. at 1064.  As a result of the flight, Hamilton alleged that he suffered severe damage to his ear.  The Ninth Circuit concluded that the prisoner officials' decision to force Hamilton to fly could have constituted deliberate indifference to his medical needs, and likened the case to those finding "deliberate indifference where prison officials and doctors deliberately ignore[ ] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." *Id*. at 1066-67 (citing *White v. Napoleon*, 897 F.2d 103, 106-10 (3d Cir.1990); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir.1970)).

REPORT AND RECOMMENDATION - 16

The court applies an objective test and a subjective test in assessing claims of deliberate indifference. *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Under the objective test, the plaintiff must show the claimed deliberate indifference of medical personnel is "incompatible with the evolving standards of decency." *Estelle*, 429 U.S. at 103. In prison condition cases such as this, the subjective test requires an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Farmer v. Brennan*, 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To satisfy the subjective test, an inmate must establish that prison officials acted "recklessly" by exhibiting "a conscious disregard to a substantial risk of serious harm," given the context of the alleged violation and the constraints facing the officials. *Id.* If one of these components is not established, the court need not inquire as to the existence of the other. *Helling*, 509 U.S. at 35.

Mr. Parmer is not claiming deliberate indifference as to general treatment provided by Defendants for his diabetes or for post-surgical care rendered at the WCC infirmary. Mr. Parmer contends that after treatment of his retinopathy began, Defendants knowingly interfered with the specialist's orders and recommendations that he be seen after his laser treatments and that this delay allowed his disease to worsen and caused the retinal detachment. Mr. Parmer claims that Dr. Navarro and Dr. Cuaycong were deliberately indifferent to his medical needs by failing to return him for follow-up treatment with Dr. Reck within six to eight weeks after he received laser treatments in November 2008. He claims that this delay caused his condition to worsen and caused his retina to detach, which required surgery in May 2009, which could have been avoided had proper follow-up been provided. He further claims that the failure to return

REPORT AND RECOMMENDATION - 17

him to Dr. Drucker for follow-up care after the May 7, 2009 surgery resulted in further damage to his right eye.

It is undisputed that Mr. Parmer did not return for follow-up treatment with Dr. Reck within six to eight weeks his laser treatment in November 2008.  Mr. Parmer was not seen by Dr. Reck until March 13, 2009, when Dr. Bednarczyk referred him for treatment of a hemorrhage. Dr. Cuaygong states that this treatment was for a new hemorrhage and posits that Dr. Reck's reference to a "regressing proliferative diabetic retinopathy" meant that Mr. Parmer's eye had responded to the prior laser treatments, regardless of whether he had been returned to Dr. Reck one or two months earlier.  See, ECF No. 43 (Cuaycong Suppl. Decl.), ¶ 3.

Mr. Parmer disputes that a *new* vitreous hemorrhage formed in March 2009.  He also disputes that the delay did not adversely affect his disease.  Plaintiff presents no independent medical evidence for this proposition.  Instead he cites to Dr. Reck's April 2, 2009 letter in support of his contention that the vitreous hemorrhage was "persistent" and "non-clearing".  ECF No. 33; ECF No. 35 (Exhibit B).  In addition, Mr. Parmer states in his sworn complaint that Dr. Reck told him that she was unable to perform any more laser treatments because of the delay between laser operations, that his condition had worsened, that there was too much blood accumulation in his right eye for effective laser treatment, and that he would require a more severe and major surgery just to pick up where his last laser operation left off and to avoid losing his eye altogether.  ECF No. 12, p. 6, ¶ 4.  He also states that Dr. Drucker told him that the retinal reattachment surgery took twice the time to repair because of the delays in his treatment. *Id.*

REPORT AND RECOMMENDATION - 18

However, there is no evidence here support an inference that either Dr. Navarro or Dr. Cuaycong deliberately ignored the express orders of Plaintiff's physicians or were deliberately indifferent to Plaintiff's medical needs.

**1)   Dr. Navarro**

The record reflects that Dr. Navarro's involvement in Mr. Parmer's care was limited to approving two consults recommended by other physicians and admitting Mr. Parmer to the WCC clinic after his May 7, 2009 surgery.  On October 30, 2008, Dr. Navarro approved PA Holloway's consult to refer Mr. Parmer to Clarus Eye Clinic and Mr. Parmer was seen by Dr. Reck that same day.  ECF No. 24 (Navarro Decl.,) ¶ 4.  Following this first referral, Dr. Reck performed two laser surgeries on Mr. Parmer's eye in November 2008 and thereafter recommended that he return to the clinic in "6-8" weeks.  ECF No. 35, p. 3.  There is no evidence that Dr. Navarro was responsible for ensuring this follow-up visit with Dr. Reck.  In fact there is a total lack of evidence as to who, within WCC, was responsible for scheduling the follow-up appointment.

Mr. Parmer was next seen by Dr. Bednarczyk on March 6, 2009 after Mr. Parmer complained of blood in his right eye.  Dr. Bednarczyk arranged his referral to Dr. Reck and Dr. Reck saw Mr. Parmer on March 13, 2009.  Dr. Reck diagnosed "a new vitreous hemorrhage (VH) and regressing PDR OD" and recommended additional PRP laser treatment OD.  ECF No. 25 (Cuaycong Decl.), ¶ 4.  Dr. Bednarczyk signed the WCC consult request form on March 19, 2009, acknowledging review of the consult assessment and recommendations.  *Id.*  Dr. Bednarcyzk also saw Mr. Parmer on April 2, 2009, when it was determined that he should be referred to Retina Consultants for surgery.  *Id.*

REPORT AND RECOMMENDATION - 19

Following his surgery on May 8, 2009, Dr. Navarro admitted Mr. Parmer to the WCC infirmary for post operative care. His order included that Mr. Parmer lie face down during the day and on his right side at night and to wear the eye patch. He also ordered that Mr. Parmer be given his normal medications for diabetes including insulin and eye medications recommended by his surgeon. ECF No. 24 (Navarro Decl.), ¶ 5. Mr. Parmer does not contend that this care was in any way constitutionally deficient.

Dr. Navarro's next involvement with Mr. Parmer's medical care did not occur until November 13, 2009. On that day, PA Figueroa examined Mr. Parmer who was complaining of blurred vision in his right eye. PA Figueroa submitted a consult request and Dr. Navarro approved the request. Mr. Parmer was seen by Dr. Reck a few days later on November 17, 2009. *Id.*, ¶ 6. At that time, Dr. Reck diagnosed a new vitreous hemorrhage and Dr. Cuaycong immediately prepared Mr. Parmer's referral to Dr. Yeh. ECF No. 43 (Cuaycong Supp. Decl.), ¶ 5.

Viewing this evidence in the light most favorable to Mr. Parmer, the undersigned concludes that Mr. Parmer has failed to raise an issue of material fact as to whether Dr. Navarro acted recklessly with a conscious disregard of serious harm. At best, it appears that Plaintiff's claims against Dr. Navarro are based on supervisory liability. There is no such liability under section 1983. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.") Instead, an official is only liable for his own conduct. *Id.,* 556 U.S. at 677, 129 S.Ct. at 1949. There is no evidence that Dr. Navarro personally participated in the constitutional deprivation alleged nor is there evidence of a sufficient causal connection between Dr. Navarro's conduct and the alleged deprivation.

REPORT AND RECOMMENDATION - 20

2)      **Dr. Cuaycong**

Dr. Cuaycong was not involved in Mr. Parmer's care until shortly before his scheduled surgery with Dr. Drucker in 2009.  On April 13, 2009, she received the consult report from Retina Consultants.  Her first visit with Mr. Parmer was on May 5, 2009.  At that time, she spoke to Dr. Haynie of Retina Consults to relay Mr. Parmer's concern about the one month delay until his surgery.  She was assured by Dr. Haynie that "due to the chronic nature of the TRD the timeline to surgery would not adversely affect the plaintiff's condition."  According to Dr. Cuaycong, Dr. Haynie was more concerned about the overall health of Mr. Parmer's retina in light of his long history (over 15 years) of diabetes mellitus.  He also informed Dr. Cuaycong at this time that Mr. Parmer's visual prognosis was "guarded."  ECF No. 25 (Cuaycong Decl.), ¶¶ 6-7.

Dr. Cuaycong saw Mr. Parmer again on May 11, 2009 when Mr. Parmer was recovering in the WCC infirmary after his surgery.  At that time, she reminded him of his post-operative instructions to wear his eye patch and remain face down or on his right side for optimal healing.  ECF No. 43 (Suppl. Cuaycong Decl.), ¶ 1. As noted above, Mr. Parmer's post-operative care is not at issue.

On May 12, 2009, Dr. Cuaycong discharged Mr. Parmer from the infirmary.  As part of the discharge she ordered medications prescribed by his surgeon and ordered follow-up appointments with Dr. Drucker and Dr. Reck.  ECF No. 43 (Suppl. Cuaycong Decl.), ¶ 1.  She was also in contact with Dr. Drucker and his staff to coordinate Mr. Parmer's postoperative care and follow-up.  *Id.*, ¶ 2.  The record reflects that Mr. Parmer was not sent to see Dr. Drucker.  However, the record reflects that he was sent to Dr. Reck as ordered in Dr. Cuaycong's discharge

1   papers.  On June 9, 2009, Dr. Reck noted that Plaintiff was doing well one month post-surgery.

2   ECF No. 25 (Cuaycong Decl.), p. 5, ¶ 8.

3          Viewing this evidence in the light most favorable to Mr. Parmer, the undersigned

4   concludes that Mr. Parmer has failed to raise an issue of material fact as to whether Dr.

5   Cuaycong acted recklessly with a conscious disregard of serious harm.  The evidence reflects

6   that Dr. Cuaycong had no involvement with Mr. Parmer until almost four and one-half months

7   following the initial treatment by Dr. Reck.  As such, Dr. Cuaycong could have no responsibility

8   for the failure to have the Plaintiff see Dr. Reck six to eight weeks after the laser treatment in

9   November 2008.  In addition, the evidence reflects that Dr. Cuaycong promptly assessed,

10  administered treatment, and made referrals to outside specialists.  There is no evidence that Dr.

11  Cuaycong intentionally delayed or interfered with Mr. Parmer's treatment.  While it is true that

12  Mr. Parmer was not seen by Dr. Drucker for follow-up as ordered by Dr. Cuaycong, there is no

13  evidence that such failure was the fault of Dr. Cuaycong.

14         Based on the sworn affidavits, evidence submitted by both parties, and inferences that

15  may be reasonably drawn from this evidence, the undersigned concludes that while Dr.

16  Cuaycong knew of a serious risk of harm, there is no evidence that she acted with deliberate

17  indifference to those needs.

18  **B.     Department of Corrections**

19         The Court recommends dismissing Plaintiff's claims against Defendant Washington State

20  Department of Corrections (DOC) because the DOC is not a "person" for purpose of liability

21  arising under 42 U.S.C. § 1983.  The United States Supreme Court has held that neither a state

22  agency or state official sued in their official capacity are "persons" for purposes of 42 U.S.C. §

REPORT AND RECOMMENDATION - 22

1983.  *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66, 109 S. Ct. 2304 (1989);

*Maldonado v. Harris,* 370 F.3d 945, 951 (9th Cir. 2004).

**C.      Qualified Immunity**

Defendants Navarro and Cuaycong contend that they are entitled to qualified immunity

from suit.  In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the

Supreme Court mandated a two-step sequential process for resolving such claims.  First, courts

consider the threshold question: "Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier*,

533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the

premises alleged, a court might find it necessary to set forth principles which will become the

basis for a holding that a right is clearly established."). Second, "if a violation could be made out

on a favorable view of the parties' submissions, the next, sequential step is to ask whether the

right was clearly established." *Id.*  In *Pearson v. Callahan*, 553 U.S. 223, 235-236, 129 S.Ct.

808, 818, 172 L.Ed.2d 565 (2009), the Court receded from *Saucier*, holding "that the *Saucier*

protocol should not be regarded as mandatory in all cases," but instead judges should exercise

their sound discretion as to which of the two prongs of the analysis to address first.  *Id.*

The undersigned has determined that there has been no violation of the Plaintiff's civil

rights by the named defendants.  Therefore, this issue need not be reached.

**CONCLUSION**

For the reasons stated above, the undersigned recommends that Defendants' motion for

summary judgment (ECF No. 23, renewed at ECF No. 42) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

fourteen (14) days from service of this Report and Recommendation to file written objections.

REPORT AND RECOMMENDATION - 23

See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **February 1, 2013,** as noted in the caption.

　　　　**DATED** this  14th   day of January, 2013.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 24